# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANGELA LISZKIEWICZ, Independent Administrator of the Estate of SCOTT LISZKIEWICZ, deceased, <br><br> Plaintiff, <br><br> v. <br><br> CRG RESIDENTIAL, LLC, CHRIS R.C. SCHWARTZ, doing business as RC CONSTRUCTION, and STONEY CREEK CONSTRUCTION, <br><br> Defendants. | No. 15 C 4088 <br><br> Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

This case arises from the unfortunate death of Scott Liszkiewicz. Mr. Liszkiewicz died after falling from a second-story balcony while working on a renovation project. Following his death, Angela Liszkiewicz, his surviving spouse, sued several contractors working on the project for negligence. One of the contractors, CRG Residential, LLC ("CRG"), has filed for summary judgment, arguing that it cannot be held liable for Mr. Liszkiewicz's death because it did not owe him a duty of care. More precisely, CRG contends that it cannot be held liable under Illinois law because it did not retain control over Chris R.C. Schwartz (doing business as RC Construction, hereafter "RC"), the subcontractor who allegedly caused Mr. Liszkiewicz to fall. Because the Court finds that there is a genuine issue of material fact about whether CRG retained sufficient control over RC's work to give rise to a duty of care, CRG's summary judgment motion is denied.

# BACKGROUND[1]

The accident that claimed Mr. Liszkiewicz's life occurred while he was working on a renovation project at the Prairie View Apartments in Bellwood, Illinois (the "Prairie View project"). The project, which consisted of renovating the interior and exterior of several townhomes, was headed by Urban Innovations, Ltd. ("UIL"). UIL subcontracted the exterior work on the project to CRG via a written agreement. That agreement called for CRG to replace all of the roofing, gutters, siding, soffits, and windows in the townhome complex between June and November 2014. (UIL General Contractor / Sub-Contractor Agreement 2, 6-7, Ex. I, ECF No. 159-4.) It also required CRG to "furnish all labor, materials, tools, equipment and supervision necessary to perform" those services. (*Id.* at 2.) CRG in turn subcontracted much of the exterior work to RC; it entered into three written subcontracts with RC to complete the roofing, window, and siding work. Under those agreements, RC was required to provide all "labor, equipment, [and] tools" to complete its work. (CRG Subcontract Agreements 1-3, Ex. J, ECF No. 159-4.)

The project proceeded without incident until mid-November 2014. Randy Whipple was the supervisor for the exterior work on behalf of CRG. (CRG SOF 25.)[2] Whipple was on site on a daily basis, averaging around forty hours per week. By early November, RC crews had completed the siding work on all but two of the buildings in the complex: building 14 and the maintenance building. On November 18, 2014, the date of the accident, RC was installing siding

---

[1] The facts set forth below are undisputed except where indicated.

[2] Liszkiewicz disputes this fact on the basis that Whipple "was to supervise the work of CRG's subcontractor R.C. Construction for the exterior work." (Pl. Contested Material Facts ¶ 25, ECF No. 159.) However, whether Whipple "was to supervise [RC's work]" does not make false CRG's statements that "Whipple was the supervisor of the exterior work" or that Whipple fulfilled the supervisor role "on behalf of CRG."

on the maintenance building, while a CRG crew removed windows and installed Tyvek on building 14. Both buildings were located near each other in the same cul-de-sac.

RC utilized a six-person crew to install the siding on the maintenance building on the day of the accident. Juan "Ray" Ruiz, along with Manual and Victor Contreras (who are brothers), installed siding on one end of the two-story building, while James Florio, the RC foreman, and two other crew members installed siding on the opposite end. The side of the building where Ruiz and the Contreras brothers were working included a second-floor balcony. On the morning of the accident, Ruiz was uncertain whether he should install siding around the balcony railing or cut the railing and put a block behind it. Ruiz testified that he sought out Whipple to obtain clarification on how to proceed. (Ruiz Dep. 29:6-30:24.) He spoke with Whipple around 10:00 am near the maintenance building and asked: "How [do] you want it on the handrail, block or just make the siding around to the handrail?" (*Id.* at 29:15-30:24, 34:16-25.) Whipple responded that "[h]e want[ed] to bring the screws and that way he could screw it," which Ruiz understood to mean that he should cut the railing and that Whipple would return with screws to reattach it. (*Id.* at 35:1-36:25.) Whipple disputes that he spoke to Ruiz in person about the balcony railing. Instead, he testified that he spoke with Ruiz over the phone the morning of the accident about a handrail on an interior stairwell and instructed Ruiz to put it back the way he found it. (Whipple Dep. 60:19-61:10.)

Ruiz cut the railing and installed the block shortly after his conversation with Whipple. Florio heard someone using a saw and went to the side of the building where Ruiz was working to investigate. Because Florio had told Ruiz on two prior occasions not to cut the railing, he confronted Ruiz about why he had done so. Ruiz responded that Whipple had told him to cut the railing. Florio then threw his hands up and assumed the issue was handled. About thirty minutes

later, Ruiz told other members of his crew to temporarily nail the railing back in place. The RC crew then continued to install siding on the maintenance building and forgot about the railing.

Around 3:00 p.m., Mr. Liszkiewicz, who was an employee of UIL, went onto the balcony of the maintenance building to change a light fixture. While on the balcony, an RC laborer asked Mr. Liszkiewicz to hand him a tool. In the process, Mr. Liszkiewicz leaned on the railing and fell off the balcony. At the time of the accident, Whipple was at building 14. (Whipple Dep. 72:15-73:8.) After the accident, Florio confronted Whipple about the railing and the screws. According to Florio, Whipple at first acted like "he didn't know what [Florio] was talking about." (Florio Dep. 68:17-70:5.) However, Whipple later admitted that "he had known about getting [the screws] and told Ray [Ruiz] to cut that railing." (*Id.* at 70:6-71:4.)[3]

Following her husband's death, Angela Liszkiewicz filed suit against CRG, RC, and another contractor on the Prairie View project under the Illinois Wrongful Death Act, 740 Ill. Comp. Stat. 180/1 *et seq.*, and the Survival Act, 755 Ill. Comp. Stat. 5/27-6. In her amended complaint, Liszkiewicz asserts two claims against CRG for construction negligence, both of which are governed by section 414 of the Restatement (Second) of Torts.[4] (Am. Compl. 1-6, ECF No. 28.) CRG moves for summary judgment on both of those claims, asserting that it cannot be held liable as a matter of law because it did not retain control over RC's work on the Prairie View project, and thus, did not owe Mr. Liszkiewicz a duty of care at the time of his accident.

---

[3] The parties dispute Florio's account of what happened after the accident.

[4] Liszkiewicz's amended complaint does not cite to the Restatement. Nonetheless, she confirmed in her response to CRG's motion for summary judgment that her negligence claims against CRG are grounded in section 414 of the Restatement. (Pl. Mem. in Opp'n to CRG Mot. Summ. J. 1 n.1, 18, ECF No. 160.) As such, the Court need not analyze whether a duty of care arises under a premise liability theory under section 343 of the Restatement. (*See* CRG Mem. in Supp. of Mot. Summ. J. 13-15, ECF No. 145.)

# DISCUSSION

Summary judgment is appropriate only if CRG shows that there is "no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014). When considering a motion for summary judgment, the Court construes "all facts and makes all reasonable inferences in favor of the non-moving party." *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence . . . or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (internal quotation marks and citations omitted). Rather, the Court's role is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citation omitted).

Summary judgment here revolves solely around whether CRG had a duty of care with regard to RC's work on the Prairie View project. In Illinois, a general contractor is typically not liable for the conduct of its subcontractors. *Carney v. Union Pac. R.R. Co.*, 2016 IL 118984 ¶ 31, 77 N.E.3d 1, 7 (2016). The rule is premised on the notion that a general contractor has "no control over the details and methods of the independent contractor's work" and, as a result, "is not in a good position to prevent negligent performance." *Id.* ¶ 32, 77 N.E.3d at 7. But that is the general rule and Illinois courts have long recognized an exception under section 414 of the Restatement. *Id.* ¶¶ 33-35, 77 N.E.3d at 8. Under the exception, a general contractor who employs a subcontractor, but retains control over any part of its work, is subject to liability for physical harm to others for whose safety the general contractor owes a duty of reasonable care. *Id.* ¶ 33, 77 N.E.3d at 8; Restatement (Second) of Torts § 414 (1965).

A general contractor's duty of care arises under section 414 if it "retained at least some degree of control over the manner in which the [subcontractor's] work is done" such that "the subcontractor is not entirely free to do the work in his own way." *Moorehead v. Mustang Const. Co.*, 354 Ill. App. 3d 456, 459, 821 N.E.2d 358, 360 (Ill. App. Ct. 2004) (citing Restatement (Second) of Torts § 414 cmt. c (1965)), *as modified on denial of reh'g* (Jan. 27. 2005); *see also Aguirre v. Turner Const. Co.*, 501 F.3d 825, 829 (7th Cir. 2007) (applying Illinois law) ("[A] duty is triggered when the employer—usually a general contractor—has retained supervisory control over the independent contractor without retaining control over all operative details of a project."). Retained control is a question of fact that may be decided on summary judgment only if there is insufficient evidence to create a factual dispute. *Carney*, 2016 IL 118984, ¶ 41, 77 N.E.3d at 10; *see also Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill. App. 3d 491, 494, 884 N.E.2d 208, 211 (Ill. App. Ct. 2008). CRG contends that there is not enough evidence to establish that it retained control of RC—the subcontractor that cut the railing from which Mr. Liszkiewicz fell—and thus, had no duty of care during the accident. The Court disagrees.

A reasonable jury could find that CRG retained control based on its presence on the jobsite and oversight of RC's work. Retained control may be established where, as here, there is evidence that the general contractor is "consistently present on the jobsite directing operative details of the subcontractor's work." *Moiseyev v. Rot's Bldg. & Dev. Inc.*, 369 Ill. App. 3d 338, 351, 860 N.E.2d 1128, 1138 (Ill. App. Ct. 2006) (citations omitted); *see also Rogers v. West Const. Co.*, 252 Ill. App. 3d 103, 106, 109, 623 N.E.2d 799, 801-03 (Ill. App. Ct. 1993) (discussing how daily supervision of worksite could lead to imposition of duty under section 414 where general contractor is primarily focused on supervising manner of subcontractor's work, not checking daily progress); *Wilkerson*, 379 Ill. App. 3d at 493-94, 884 N.E.2d at 210 (citing

Restatement (Second) of Torts § 414 cmt. b (1965) (finding that liability "commonly arises when a general contractor entrusts work to a subcontractor but superintends the job himself or through a foreman"). There is no dispute that CRG maintained a constant presence on the Prairie View project. Whipple, CRG's superintendent, supervised the exterior renovations on a full-time basis. Notably, he was on site at the time of the accident.[5]

The record also contains evidence that Whipple directed operative details of RC's work. Several RC crew members testified that they viewed Whipple as their superior. Ruiz stated that "[Whipple] was the supervisor" on the project and that he did his "job according to [Whipple's] specifications." (Ruiz Dep. 31:20-24.) The Contreras brothers testified in a similar manner. Manuel agreed that he "answered" to Whipple, (M. Contreras Dep. 31:1-8), while Victor testified that the "only one [he] would even take any orders from would be [Whipple]," (V. Contreras Dep. 54:10-24). Florio, the RC foreman, also testified that Whipple supervised his crew. (Florio Dep. 15:12-16:14.) Moreover, Florio testified that he went to Whipple with any questions he had about the project and that Whipple directed his crew on how to complete their renovation work. According to Florio, Whipple specified how he "wanted the [installation] done," including how to install "trim on the windows . . . or the corners a certain way." (*Id.* at

---

[5] Citing *Gerasi v. Gilbane Bldg. Co., Inc.*, 2017 IL App (1st) 133000, ¶ 45, 75 N.E.3d 305, 315-16 (2017), CRG argues that Whipple's constant presence on the jobsite does not "come into play" under section 414 until after a court has determined the general contractor has retained control. (CRG Reply in Supp. of Mot. Summ. J. 4-5, ECF No. 164.) In other words, CRG contends that Whipple's constant on-site presence is irrelevant to this analysis. But that is not so. As an initial matter, the Court does not read *Gerasi* in the same manner as CRG. In examining comment b to section 414, the court in *Gerasi* merely stated that it must first decide the issue of control before turning to the other elements of section 414 liability, such as whether the general contractor knew (or should have known) that the subcontractor was working in an unsafe manner. *Id.* ¶¶ 45-46, 75 N.E.3d at 315-16. Moreover, it defies logic that a general contractor's pervasive monitoring of a work site has no bearing on the issue of retained control. Indeed, other courts have recognized that it is directly relevant to the analysis. *See, e.g.*, *Shaughnessy v. Skender Const. Co.*, 342 Ill. App. 3d 730, 739-40, 794 N.E.2d 937, 944 (Ill. App. Ct. 2003).

16:15-17:8.) Florio added that "on occasion," Whipple watched his crew as they worked and provided instruction on how to install the Hardie board siding. (*Id.* at 17:9-23.)

Finally, and more to the point, RC crewmembers testified that Whipple authorized Ruiz to cut the railing from which Mr. Liszkiewicz fell. Ruiz testified that he asked Whipple for permission to cut the railing on the day of the accident, that Whipple told him to do so, and confirmed that he (Whipple) would get the screws necessary to refasten the railing after the siding had been installed. (Ruiz Dep. 29:8-30:4, 34:11-36:25.) Following that conversation, Ruiz believed Whipple had given him permission to the cut the railing. (*Id.* at 37:1-5.) Florio's testimony corroborates Ruiz's account.[6] Florio testified that after the accident, Whipple admitted "he had known about getting [the screws] and told [Ruiz] to cut that railing." (Florio Dep. at 68:20-72:8.)

Whipple disputes most of the above testimony. He states that he did not supervise RC on the Prairie View project; instead, he merely inspected its work to make sure everything "was getting done." (Whipple Dep. 29:4-12.) Whipple also testified that he never instructed Ruiz to cut the balcony railing. (*See id.* at 60:19-61:10.) But Whipple's testimony is of little help here to CRG. What matters for purposes of this motion is that a jury ***could*** credit the RC crew's testimony that Whipple supervised their work, provided direction on the manner in which they installed siding, and authorized Ruiz to the cut the balcony railing. In other words, their testimony could establish not only that RC was "not entirely free to do the work in [its] own way," Restatement (Second) Torts § 414, cmt. c (1965), but also that CRG authorized the very

---

[6] Florio also testified that, before the accident, he asked Ruiz why he had cut the railing, to which Ruiz responded that Whipple had told him to do so. (Florio Dep. 38:22-39:11.) As evidence of why Ruiz cut the railing, however, this statement would likely constitute inadmissible hearsay; accordingly, the Court does not consider it in evaluating whether there is a fact dispute about whether CRG retained control over RC's work.

8

work that allegedly led to Mr. Liszkiewicz's death, *see Brooks v. Midwest Grain Prods. of Ill., Inc.*, 311 Ill. App. 3d 871, 874-75, 726 N.E.2d 153, 155-56 (Ill. App. Ct. 2000) (reversing summary judgment for hiring entity and finding genuine issue of retained control where jury could infer that subcontractor was not allowed to continue with work that led to accident until it received confirmation from hiring entity that work was being performed correctly).

CRG attempts to escape this conclusion by raising a number of arguments. First, it contends that Whipple's instruction to cut the balcony railing (even if true) is not evidence of retained control because he did not direct Ruiz on how to "safely cut the railing," but rather specified "the end result" of how he wanted the railing to look. (CRG Mem. 12, ECF No. 145.) This argument is meritless. The relevance of Ruiz and Florio's testimony about the railing is that Ruiz *asked* Whipple about whether he should cut it. That Ruiz felt the need to obtain Whipple's permission supports the conclusion that Whipple had control over the manner of RC's work. And, considering that there is evidence Whipple directed RC in other ways (such as demonstrating how window trim should be cut), a reasonable jury could find CRG retained enough control over RC to be able to prevent Mr. Liszkiewicz from falling. If the testimony of the RC workers is credited, a jury's conclusion that Whipple could have directed Ruiz not to cut the railing would be eminently reasonable.

CRG also argues that there is no genuine issue of retained control because Whipple never "involved himself with the safety of [RC's] crew" or implemented a safety plan that required RC to alter the way it carried out its work. (CRG Mem. 8-9, ECF No. 145.) While it is true that several courts have focused on a general contractor's implementation and enforcement of safety measures on the construction site when finding a genuine issue of retained control, *see, e.g.*, *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1061-63, 728 N.E.2d 726, 734-36

(Ill. App. Ct. 2000); *Aguirre*, 501 F.3d at 830-31, it is not the only consideration, *see Moiseyev*, 369 Ill. App. 3d at 351, 860 N.E.2d at 1138 (finding, after review of Restatement and case law, that retained control may be established when "defendant supervises the entire job and effects the means and methods of the subcontractor's work . . . **and/or** is consistently present on the jobsite directing operative detail of the subcontractor's work, **or** supervises the entire safety program"); *see also Brooks,* 311 Ill. App. 3d at 874, 726 N.E.2d at 155 ("[A]n employer need only retain the control of any part of the work in order to be subject to liability for a failure to exercise his control with reasonable care.") (citation omitted). Moreover, CRG ignores evidence that Whipple had the power to stop RC's work if he identified a safety hazard. (Pl. SOF 22.)[7] While the power to stop work, alone, is insufficient to create a genuine issue of retained control, *see* Restatement (Second) § 414 cmt. c (1965), the power here—in light of the other evidence about Whipple's on-site presence and oversight of RC's work—supports the conclusion that Whipple was in a position to prevent the accident.

Finally, CRG contends that it had no duty of care because it did not retain contractual control over RC's work or the safety measures to be implemented on the project. (CRG Mem. 6-7, ECF No. 145.) But even if the Court were to accept CRG's interpretation of the Prairie View contracts,[8] a jury could still find it retained control of RC based on its on-site conduct. *See*

---

[7] CRG disputes this fact on the basis that Liszkiewicz failed to cite the correct deposition testimony to support it. (CRG Resp. to Pl. SOF ¶ 22, ECF No. 165). Nonetheless, there is some evidence in the record to support the fact that Whipple could have stopped RC's work for safety reasons. (Florio Dep. 34:3-22.)

[8] The parties dispute how to interpret the contracts between UIL, CRG, and RC. CRG argues that because its subcontracts with RC are silent on the issue of supervision, CRG did not retain the right to supervise RC's work. (CRG Mem. 6-7, ECF No. 145.) Liszkiewicz points out that under CRG's contract with UIL (the principal contractor), CRG was required to furnish all "supervision necessary to perform" the exterior work on the Prairie View project. (UIL Agreement 2, Ex. I, ECF No. 159-4.) Moreover, because CRG did not "pass through" that supervision requirement in its subcontracts with RC, CRG retained that responsibility throughout

*Carney*, 2016 IL 118984, ¶ 41, 77 N.E.2d at 842 (holding that while written agreements between contractors are often "best indicator" of who retained control on construction projects, "control may yet be demonstrated by evidence of defendant's conduct at variance with [those] agreement[s]"). Therefore, because there is a genuine issue of fact over whether CRG retained control under section 414 of the Restatement,[9] the Court cannot find as a matter of law that CRG owed no duty of care to Mr. Liszkiewicz. Accordingly, the Court denies CRG's motion for summary judgment.

Date: October 10, 2017

John J. Tharp, Jr.
United States District Judge

---

the project. (Pl. Resp. 14, ECF No. 160.) Neither party cites any authority to address this specific issue. Nonetheless, because the Court finds there is a genuine issue of retained control based on CRG's conduct during the project, it need not resolve the contractual dispute at this time. Nor does the Court need to determine whether CRG's Written Safety Program created an obligation for Whipple to supervise RC during the project. (*See* Pl. Resp. 15-17, ECF No. 160.)

[9] CRG also contends in its reply brief that it cannot be held liable under section 414 because Whipple did not know, and could not have known, about the railing's dangerous condition because he did not see Ruiz cut the railing and because it was impossible to tell from a distance that the railing had been cut after RC temporarily nailed it back in place. (CRG Reply 5, ECF No. 164.) CRG's argument, though, is unavailing. Because there is evidence that Whipple authorized Ruiz to cut the railing and promised to return with screws to reattach it, (Ruiz Dep. 34:16-37:1-5), a reasonable jury could find that Whipple knew or should have known that RC cut the railing and failed to properly secure it back in place.